**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ARIANA M., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-14-3206 |
| | § | |
| HUMANA HEALTH PLAN OF TEXAS, | § | |
| INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Ariana M. sued Humana Health Plan of Texas, Inc., under the Employee Retirement Income Security Act ("ERISA"), alleging that Humana had wrongfully denied benefits for 106 days of partial hospitalization to treat an eating disorder. *See* 29 U.S.C. § 1132(a)(1)(B). Humana had paid for 49 days of partial hospitalization before determining that Ariana M. did not meet the criteria for continued coverage at that level. Instead, she was covered for the next level of care, intensive outpatient. This court granted summary judgment for Humana, holding that it did not abuse its discretion in denying the benefits. Ariana M. appealed. On appeal, the Fifth Circuit acknowledged that its standard of review for ERISA cases was at odds with that of most circuits and changed the law. *Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246 (5th Cir. 2018) (en banc). The Fifth Circuit held that district courts are to review *de novo* a plan administrator's decision to deny coverage under an ERISA plan. *Id.* at 256. The Fifth Circuit vacated the order granting summary judgment and remanded for this court to apply the *de novo* standard.

On remand, both Ariana M. and Humana moved for summary judgment. Ariana M. argued that her continued partial hospitalization was medically necessary; Humana argued that the administrative record showed that it was not necessary and moved to strike the materials that Ariana

M. attached to her motion because they were outside the administrative record. The court heard oral argument on the motions.

Based on the pleadings, the parties' arguments and submissions, the administrative record, and the applicable law, the court grants Humana's motion to strike and motion for summary judgment and denies Ariana M.'s cross-motion for summary judgment. A *de novo* review of the administrative record reveals that Ariana M.'s continued partial hospitalization was not medically necessary after June 4, 2013, after she had been covered for 49 days. Final judgment is entered by separate order. The reasons are set out in detail below.

## I. Background

### A. Facts

#### 1. The Plan Terms

Ariana M. is a minor. In 2013, she lived with her parents and three younger siblings in Woodlands, Texas. Ariana M.'s father participated in the group health plan sponsored by Eyesys Vision Plan Inc. and administered by Humana. Throughout 2013, Ariana M. was a dependent eligible for benefits under the plan.

Ariana M. has a history of an eating disorder characterized by compulsive exercising, purging, and restricting based on a belief that she was overweight. She also has a history of cutting herself. She has received extensive treatment. Since 2007, Ariana M. had received outpatient treatment, including intensive outpatient treatment, from her primary care provider. (Admin. Record

at 131–32).  In 2008, 2011, and 2012, Ariana M. was admitted to treatment centers for partial hospitalization.[1]

Ariana M.'s plan authorized a maximum of 90 days of "partial hospitalization care, treatment in a psychiatric day treatment facility, crisis stabilization unit, or residential treatment center for children or adolescents." (*Id.* at 794 (emphasis omitted)).  Her plan defined "outpatient" to mean that "*you* are not *confined* as a registered bed patient." (*Id.* at 880).  "Inpatient" meant that "*you* are *confined* as a registered bed patient." (*Id.* at 876).  The plan defined an "intensive outpatient program" to include:

- Group therapeutic sessions greater than one hour a day, three days a week;
- *Behavioral health* therapeutic focus;
- Group sessions centered on cognitive behavior constructs, social/occupational/educational skills development and family interaction;
- Additional emphasis on recovery strategies, monitoring of participation in 12-step programs and random drug screenings for the treatment of *chemical dependency*; and
- Physician availability for medical and medication management.

(*Id.*).  "Partial hospitalization" is defined as:

services provided by a hospital, health care treatment facility, chemical dependency treatment center, crisis stabilization unit, psychiatric day treatment facility or residential treatment center for children and adolescents in which patients do not reside for a full 24-hour period:
- For a comprehensive and intensive interdisciplinary psychiatric treatment for minimum of 5 hours a day, 5 days per week;
- That provides for social, psychological and rehabilitative training programs with a focus on reintegration back into the community and admits children and adolescents who must have a treatment program designed to meet the special needs of that age range; and
- That has physicians and appropriately licensed behavioral health practitioners readily available for the emergent and urgent needs of the patients.

---

[1]  In 2008, Ariana M. was admitted to a partial hospitalization program at Laureate Psychiatric Hospital, a residential treatment center.  (Admin. Record at 132).  In January 2011, she was admitted to Kingwood Pines for in-patient treatment.  (*Id.*).  In August 2012, she received treatment at Timberline Knolls, another residential treatment center.  (*Id.*).  In November 2012, she was admitted to a partial hospitalization program at Linden Oaks.  (*Id.*).

(*Id.* at 880–81 (emphasis omitted)). "Residential treatment" for children and adolescents meant treatment in an institution that:

- Provides residential care and treatment for emotionally disturbed individuals; and
- Is accredited as a residential treatment center by the Council on Accreditation of Healthcare Organizations or the American Association of Psychiatric Services for Children.

(*Id.* at 883). The plan covered partial hospitalization for medically necessary treatment, defining "medically necessary" to mean:

> health care services that a *health care practitioner* exercising prudent clinical judgment would provide to his or her patient for the purpose of preventing, evaluating, diagnosing or treating a *sickness* or *bodily injury* or its symptoms. Such health care service must be:
>
> - In accordance with nationally recognized standards of medical practice;
> - Clinically appropriate in terms of type, frequency, extent, site, and duration, and considered effective for the patient's *sickness* or bodily *injury*;
> - Not primarily for the convenience of the patient, physician or other health care provider; and
> - Not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the patient's *sickness* or *bodily injury*.
>
> For the purpose of *medically necessary*, generally accepted standards of medical practice means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations, the view of physicians practicing in relevant clinical areas and any other relevant factors.

(*Id.* at 877). Humana used a set of clinical criteria—contained in the Mihalik Group Medical Necessity Manual for Behavioral Health: Partial Hospitalization Treatment Mental Health Care—to assess the medical necessity of partial hospitalization in treating mental illness. In Ariana M.'s case, eight criteria had to be present "throughout the episode of care" to make the services medically necessary. The first criterion incorporated national standards of medical care; the remaining criteria provided details.

PM.A.g.1.  The services must be consistent with nationally accepted standards of medical practice.

PM.A.g.2.  The services must be individualized, specific, and consistent with the individual's signs, symptoms, history, and diagnosis.

PM.A.g.3.  The services must be reasonably expected to help restore or maintain the individual's health, improve or prevent deterioration of the individual's behavioral disorder or condition, or delay progression in a clinically meaningful way of a behavioral health disorder or condition characterized by a progressively deteriorating course when that disorder or condition is the focus of treatment for this episode of care.

PM.A.g.4.  The individual complies with the essential elements of treatment.

PM.A.g.5.  The services are not primarily for the convenience of the individual, provider, or another party.

PM.A.g.6.  Services are not being sought as a way to potentially avoid legal proceedings, incarceration, or other legal consequences.

PM.A.g.7.  The services are not predominantly domiciliary or custodial.

PM.A.g.8.  No exclusionary criteria of the health plan or benefit package are met.

(*Id.* at 1566).  The following set of criteria must be satisfied to initiate treatment:

PM.A.i.1.  Based on a behavioral health history and mental status evaluation completed by a psychiatrist or by a behavioral health professional licensed, certified, or registered to practice independently and reviewed by a psychiatrist prior to initiation of treatment, the individual is diagnosed as having, or there is strong presumptive evidence that the individual has a diagnosis of, a mental disorder or condition according to the most recent version of the *Diagnostic and Statistical Manual of Mental Disorders* that requires, and is likely to respond to, professional therapeutic intervention.

PM.A.i.2.  A concurrent medical assessment does not indicate that a non-behavioral medical condition is primarily responsible for the symptoms or behaviors necessitating treatment in this setting.

PM.A.i.3. The individual does not have adequate internal resources or an adequate external support system to maintain functioning without the support of an intensive multi-modal, multi-disciplinary treatment program that includes medical and/or nursing care.

PM.A.i.4.  With treatment at this level, the individual is capable of controlling behaviors and/or seeking professional help when not in a structured treatment setting.

PM.A.i.5.  If the services being proposed have been attempted previously without significant therapeutic benefit, there is a clinically credible rationale for why those same services could be effective now.

PM.A.i.6.  The place of service meets the Service Setting Criteria for Partial Hospital Treatment: Mental Health . . . .

One of the following Treatment Initiation Criteria is also required.

PM.A.i.7.  As a result of the mental disorder or condition, the individual is now a clear and present danger to self, a clear and present danger to others, or unable to provide for basic self-care needs resulting in impending, serious self-harm.

PM.A.i.8.  As a result of the mental disorder or condition:

> PM.A.i.8.1.  The individual demonstrates significant impairment in social, occupational, scholastic or role functioning that represents a deterioration in level of functioning.
>
> AND
>
> PM.A.i.8.2.  The individual has participated in and failed a substantial course of traditional or intensive outpatient treatment in the past three months.
>
> OR
>
> PM.A.i.8.3.  It is clinically probable that the individual will require initiation of a higher level of care if services are not provided at this level.

(*Id.* at 1556–67).  These criteria must be satisfied to continue treatment:

PM.A.c.1.  The individual continues to meet the treatment initiation criteria each day that services are provided at this level.

PM.A.c.2.  There is an individualized plan of active, professionally directed treatment that specifies the goals, interventions, time frames, and anticipated outcomes appropriate to:

PM.A.c.2.1.  Improve or prevent deterioration or delay progression in a clinically

meaningful way of the symptoms of, or impairment in functioning resulting from, the mental disorder or condition that necessitated initiation of treatment.

AND

PM.A.c.2.2.  Address a co-morbid substance use disorder or condition, if one exists.

PM.A.c.3.  The treatment goals, interventions, time frames, anticipated outcomes, discharge plan, and criteria for discharge are clinically efficient, reasonable, and achievable in the length of stay typically associated with treatment at this level.

PM.A.c.4.  Treatment is being rendered in a timely and appropriately progressive manner.

PM.A.c.5.  Each day the individual receives services there are progress notes by appropriate professional and non professional staff, and periodic notes by the treating psychiatrist, describing the therapeutic interventions rendered and the individual's response.

PM.A.c.6.  As appropriate, members of the individuals social support system are involved in the individual's treatment or appropriate efforts are made to enhance or develop the individual's support system.

(*Id.* at 1567–68).

## 2.  The Partial Hospitalization

On April 15, 2013, Ariana M. entered partial hospitalization at Avalon Hills in Logan, Utah, a residential treatment center that specializes in eating disorders.  (*Id.* at 130–31).  She boarded there seven days a week, with visits home to Texas for some extended weekends.  (*Id.*).  On Ariana M.'s admission, the Avalon Hills staff assessed her condition as follows:

[Ariana M.] restricts by compulsive exercising, purging and [similar] behaviors. Because [Ariana M.] continues to exercise, not eating- no specifics indicated on time frame.  Reports social anxiety causing her to purg[e] 2x per day - if she feels depress[ed] she restricts, purge[s], and cuts. [Ariana M.] states that [her] last episode of her cutting was 2 weeks ago. [Ariana M.] shave[d] a portion of her head starting from the forehead. [History] of self-harming [body] cuts from nipple to stomach and 30-40 cuts which were 1-2 inches long.  (The cuts are healed). [Ariana M.] carved

the word fat into her navel area.  ([Ariana M.] has 10 scars around her navel area).
New marks were made 3 days ago. [Ariana M.] made a mark from her clavicle to
breast area-2 vertical marks.  1 of the 2 cuts are still pink (not healed).  [Reviewer]
reports old cuts on her outer calf muscle.  [History] of cuts on [right] arm.
[Reviewer] reports (20-40) cuts on her arm.  These cuts are healed.

[Weight] 134.6, 60 inches.  BMI: 21.  Her healthy body [weight]: 105-115. . . .
Reports dizziness in the [morning], abdominal pain, nausea.  [Ariana M.] states that
she is much larger [and] that she wants to be place[d] on a 1700 cal[orie] diet.
Denies [suicidal ideation or homicidal ideation] or psychosis.

(*Id.* at 131).  At Avalon Hills, Ariana M. was to be supervised a minimum of five hours a day, have

group therapy sessions, and engage in guided activities with other patients.  Avalon Hills provided

"no specifics on [the] time frame" of her partial hospitalization, estimating that her treatment would

take 30 days.  (*Id.* at 131–33).  Humana initially agreed to cover nine days of Ariana M.'s treatment,

from April 14 to April 23, 2013, after finding her partial hospitalization to be medically necessary

under the Mihalik criteria.

On April 23, Ariana M. asked for an extension.  The same day, Dr. Rasik Lal, a child and

adolescent psychiatrist, reviewed whether continued partial hospitalization was medically necessary.

Dr. Lal called Dr. Tom Roskos, one of Ariana M.'s treating physicians at Avalon Hills, and talked

to him about her condition.  Dr. Roskos reported that Ariana M. perceived herself as overweight,

tended to overexercise, and had urges to harm herself.  (*Id.* at 132).  He stated that Ariana M. "is

above her healthy weight range" and was working with the Avalon Hills staff to "get down to her

weight range."  (*Id.*).  Dr. Roskos "hop[ed] to have con[tinued partial hospitalization] with her for

a while longer to break through some of her defenses . . . so she can get ahead of a lot of this

behavior and mindset."  (*Id.*).

After talking to Dr. Roskos and examining Ariana M.'s records, Dr. Lal determined that it

was not medically necessary for Ariana M. to remain in partial hospitalization under the Mihalik

criteria because she "was not reported as being in imminent danger to [her]self or others."  (*Id.* at

134).  His notes read:

> The last time that she seems to have demonstrated any self injurious [or] eating
> disorder behaviors [is] approximately 2 weeks which is before she started the [partial
> hospitalization] level of care.  She has not demonstrated these behaviors during the
> [partial hospitalization] treatment.  She does not have any physiological instabilities
> at this time.  She's compliant with the medications and tolerating them without side
> effects.  No vegetative signs and symptoms are reported.  The member participates
> minimally in the treatment programming [and does] not socialize with other
> members in the program and isolates.  She is described as having low motivation in
> general and also not enjoying life. . . .  No issues are identified that would require
> several hours of daily monitor treatment or frequent nursing and medical
> interventions.  The member appears to have progressed to the point of being able to
> safely [meet] treatment needs [on] an outpatient level of care.

(*Id.* at 133–34).  Following Dr. Lal's recommendation, Humana denied Ariana M.'s claim for

continued partial hospitalization coverage because Ariana M. did not pose "a danger to [her]self or

others."  (*Id.* at 99).  Humana informed Ariana M. that the Mihalik criteria were used to reach this

decision.  (*Id.*).

Avalon Hills appealed on Ariana M.'s behalf.  Humana's appeal process required an

independent review of the claim.  *See* 29 C.F.R. § 2560.503–1(h)(3)(ii).  Humana sent the claim to

AllMed Healthcare Management, Inc.  On May 8, 2013, Dr. Maria Antoinette D. Acenas, a board-

certified psychiatrist, reviewed Ariana M.'s claim for AllMed.  She spoke with Dr. Roskos, who

informed her that Ariana M. had attempted to harm another patient the night before.  (Admin.

Record at 184).  Dr. Roskos also stated that Ariana M.'s medication had been changed.  (*Id.*).  Based

on this information, Dr. Acenas concluded that an extension to Ariana M.'s stay at Avalon Hills was

medically necessary.  She stated:

> It is clear that [Ariana M.] is undergoing . . . medication changes, is severely
> depressed[,] and is at risk of self-harm or of harming others. . . .  [Ariana M.] has
> already failed intensive outpatient care, and in about approximately 10 days, the

medication adjustments and further intensive therapy should permit discharge to a
lower level of care safely.

(*Id.* at 184).  The next day, Humana approved Ariana M.'s claim for continued treatment at Avalon

Hills, authorizing 10 additional days of coverage.[2]  (*Id.* at 186).

Humana reviewed Ariana M.'s continued partial hospitalization on May 23.  Dr. Carol

Kiriakos, a board-certified psychiatrist, talked to Dr. Roskos about Ariana M., who informed her that

Ariana M. weighed 127.8 pounds and that her "[e]ating disorder behaviors at the table are

improved." (*Id.* at 1713–15).  But Dr. Roskos noted that Ariana M. tried to overexercise and took

laxative[3] when she left Avalon Hills to stay with her father for a few days.  (*Id.*).  He said that she

"has low motivation to recover[] and insists on doing things in treatment that only she wants to do."

(*Id.* at 1715).  Ariana M. told her therapist that "if she wasn't [in Avalon Hills] she'd be [harming

herself]." (*Id.*).  In Dr. Roskos's opinion, Ariana M. needed two "additional weeks of [partial

hospitalization]" because "she is starting to engage but decompensated on pass with her father." (*Id.*

at 1716).

After reviewing Ariana M.'s record and speaking with Dr. Roskos, Dr. Kiriakos found that

Ariana M. had made progress in "distress tolerance skills," "mindfulness and relaxation strategies,"

"distraction skills," "improvement with engaging with her peers,"and "has been successful in not

engaging in [eating disorder symptoms] while in this care." (*Id.* at 1716–17).  As to Ariana M.'s

physical health, Dr. Kiriakos reported that "[h]er dizziness and orthostasis has markedly improved -

hydration status improved since she no longer purge[s]." (*Id.* at 1717).  Dr. Kiriakos concluded:

---

[2] Humana sent Ariana M. a notice on May 10 that said her claim had been denied.  (*Id.* at 189–90).
This was an error that Humana corrected.

[3] Dr. Roskos stated that Ariana M. "took 6 capsules of Miralax on 5/17 and 8 capsules on 5/18 while
on pass in order to speed up weight loss."  (*Id.* at 1715).

> [Ariana M.] is making slow and steady progress. Needs some more time to solidify coping skills and relapse prevention training. She would likely relapse if had to abruptly terminate care. The extra [four] days of care recommended will serve as good time to help with [the] transition to lower level of care and give time over [the] weekend for another experimental outing with family supervision as well to see how she does outside of the structure of programming, while giving her a chance to process this experience with others in the structured setting upon her return to [the] program.

(*Id.*). Humana granted an additional four days of coverage, until May 28.

Ariana M. sought to extend her coverage again on May 29. Dr. Peter Williams, a board-certified psychiatrist, reviewed the claim for Humana. He called Dr. Roskos, who reported that Ariana M. weighed about 130 pounds, had been given more freedom in her meal plan, and had not attempted to harm herself. (*Id.* at 220). Her parents, he stated, had become firmer with her during group-therapy sessions. (*Id.*). Dr. Roskos also informed Dr. Williams that Ariana M. refused to cooperate at times with the Avalon Hills staff, wanted to overexercise, and focused on her weight. In Dr. Roskos's opinion, Ariana M. continued to "need[] this level of care to keep the structure around her and to keep her safe," and that "she got pretty quickly back into her behaviors" when she returned home for a visit. (*Id.*).

Dr. Williams disagreed with Dr. Roskos because "[Ariana M.] has no acute eating disorder issues, and [no] persistent mood problems [or] self-mutilation issues . . . . She is not acutely suicidal or psychotic or threatening others at this time, and after 42 days of [partial hospitalization] is ready for maintenance in [an intensive outpatient program]." (*Id.* at 221). Applying the Mihalik criteria, Dr. Williams concluded that continued care at the partial-hospitalization level was not medically necessary, because Ariana M. "was not aggressive or threatening" and "[t]here was no report of medical instability." (*Id.*). On May 29, Humana informed Ariana M. that extended partial

hospitalization would not be covered, stating that it used the Mihalik criteria to reach this decision. (*Id.* at 225).

Avalon Hills appealed for Ariana M. (*Id.* at 264). Humana sent the claim to Physicians' Review Network, Inc. for external review. On May 30, Dr. Ashraf Ali, a board-certified psychiatrist reviewed Ariana M.'s file for Physicians' Review Network and called Dr. Roskos. Dr. Ali learned that

> [Ariana M.] was not trying to self harm. She had a lot of sadness and a kind of reactivity. She used the phrase "because I'm fat" for excuses for everything . . . . She focused back on her appearance and her weight very readily all the time. . . . [T]he patient is diagnosed with Major Depressive Disorder and Eating Disorder and she continues to be severely symptomatic.

(*Id.* at 315–16). Based on the Mihalik criteria, Dr. Ali determined that Ariana M. met medical necessity because she remained "severely symptomatic." (*Id.* at 316). He found that she "is still depressed and has urges to self harm" and that "[s]he is still preoccupied with her body image and continues to restrict and over exercise." (*Id.*). He concluded that Ariana M. "require[d] more time in the [partial hospitalization] in order to get stabilized." (*Id.*). On May 31, Humana authorized continued partial hospitalization until June 4. (*Id.* at 324).

On June 4, Avalon Hills asked Humana to cover continued partial hospitalization. Dr. Manjeshwar Prabhu, a board-certified adult psychiatrist, reviewed the claim for Humana. He called Avalon Hills and spoke to Dr. Jeremy Hilton, another one of Ariana M.'s treating physicians, because Dr. Roskos was out of town. Dr. Hilton stated that while Ariana M. "is really struggling to make any changes and she is using all kinds of distractions to avoid facing some of her behaviors," the "whole team says she really has cont[inued] to exhibit multiple changes in moving towards recovery." (*Id.* at 326). Dr. Hilton was specific about the improvements. Ariana M. denied

12

having suicidal thoughts, was permitted the highest level of physical activity, her medication level was stable and had not changed, and her parents were "holding the line more in family therapy." (*Id.*). Dr. Hilton cautioned that Ariana M. remained "at a high risk of relapse and self-harm and . . . going in a downward spiral if she weren't in this structure." (*Id.*).

After considering the record and Dr. Hilton's report, Dr. Prabhu determined that partial hospitalization was no longer medically necessary. He stated:

> After certifying 49 days of [partial hospitalization] care, [Ariana M.] is not progressing in treatment and she appears to be at her baseline behaviors. She is not suicidal, homicidal, or psychotic and she has no complications with her eating disorder. She is 5 feet tall and her current weight is 134.5 lbs which puts her at 134.5% of her ideal body weight of 100 lbs. Her parents are supportive and involved in her treatment. [Intensive outpatient care] is available for stepdown at [Avalon Hills]. Mental health [intensive outpatient care] is available near [Ariana M.'s] home. [Outpatient] providers specializing in eating disorder treatment are also available near [Ariana M.'s] home.

(*Id.* at 327). He concluded that Ariana M. did not meet the Mihalik criteria because she was "not reported to be in danger of needing a higher level of care," there were "[n]o functional impairments reported," and she "d[id] not appear to be an imminent danger to [her]self or others." (*Id.*). Humana denied Ariana M.'s claim because her risk of relapse behaviors could be treated at the next level of care, an intensive outpatient program. (*Id.* at 331).

Avalon Hills appealed this denial on Ariana M.'s behalf. On June 10, Humana sent the claim to Advanced Medical Reviews. Dr. Neil Hartman, a board-certified psychiatrist, examined Ariana M.'s record and called Dr. Roskos. (*Id.* at 359). Dr. Hartman's notes from his conversation with Dr. Roskos read:

> History of self harm, attempts and cutting. Family is participating by phone weekly with passes to achieve lower level of care (May 17 to May 19)[.] While on pass had urges to self restrict, harm self, reinforced by father which exacerbate depressive symptoms. No self harm in the structure of partial hospital. Currently has a lot of

ambivalence since Avalon is not changing the program to suit her whims. The motivation seems to come from [Ariana M.] in "getting in the way."

(*Id.* at 367). Ariana M.'s "clinical information" stated that she "continues to exercise and is not eating," she denies "suicidal ideation/homicidal ideation (SI/HI) or psychosis," and "her current weight is 134.5 pounds which is 134% of ideal body weight." (*Id.*).

Dr. Hartman applied the Mihalik criteria and concluded that continued partial hospitalization was not medically necessary. He walked through each Mihalik criterion:

> Based on the attached Mihalik Groups Medical Necessity Manual, the date of service 6/5/13 and forward does not meet medical necessity for partial hospital treatment based on PM.A.c1 level of care, partial hospitalization. [Ariana M.] is not a danger to self or others. She is not hearing voices to harm self, is medically stable and not aggressive[.]
>
> • Services must be consistent with nationally accepted standards. This criterion is met.
>
> • Services must be individualized, specific, and consistent with the individual's signs, symptoms, history and diagnosis. This criterion is not met. (Treatment plan not appropriate to individual's condition)[.]
>
> • Services must be expected to help restore or maintain the individual's health to prevent deterioration of individual's behavioral disorder or condition, or delay progression in a clinically meaningful way. The individual complies with elements of treatment. This criterion is not met.
>
> • The services are not primarily for the convenience of the individual, provider, or another party. This criterion is not met.
>
> • Services are not being sought to potentially avoid legal proceedings not applicable. This criterion is met.
>
> Based on a behavioral health history and mental status evaluation, completed by a psychiatrist, the individual is diagnosed with a mental disorder or condition according to the Diagnostic and Statistical Manual of mental disorders.
>
> PM.A.c1[.] The individual continues to meet the treatment initiation criteria each day that services are provided at this level. This criterion is not met. (She is 5 feet tall and her current weight is 134.5 pounds. -134% of ideal body weight)[.]
>
> PM.A.c2.1[.] There is an individualized plan of active, professionally directed treatment. This criterion is not met as there is no plan to meet with parents again for two to three weeks.

PM.Ac.2.2[.] Improve or prevent deterioration or delay progression in a clinically meaningful way. This criterion is not met.

As not all of the criteria are met, the requested service is not met for the dates of service 6/05/13 and forward.

(*Id.* at 367–68). In his report, Dr. Hartman listed the following resources under "References":

Milliman Behavioral Health Care Guidelines 16th Edition for Anorexia nervosa American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-5) Proposed Revision; May 2013 American Psychiatric Association. Gelder, M; Lpez-Ibor J; Andreasen N, New Oxford textbook of psychiatry. Yazgan I, MD, Greenwald B, MD, Kremen N MD, Starch J, RN, and Kramer-Ginsberg E Ph.D.

(*Id.* at 368). Dr. Hartman certified, under penalty of perjury, that "the information in this report and its attachments, if any, is true and correct to the best of my knowledge and belief." (*Id.*).

Humana denied Ariana M.'s appeal on June 12. Humana paid for 49 days of Ariana M.'s stay at Avalon Hills. Despite Humana's refusal to pay for partial hospitalization after June 4, Ariana M. remained at Avalon Hills for treatment until September 18, an additional 106 days.

## B. Procedural History

In November 2014, Ariana M. sued Humana for the cost of her treatment between June 4 and September 18, alleging that Humana wrongfully denied her medical benefits, failed to give reasonable explanations of its denials, failed to consult with health-care professionals with the appropriate training and experience, and failed to provide her with the Mihalik criteria. (Docket Entry No. 1). Humana denied these allegations. (Docket Entry No. 11).

Humana moved for summary judgment in December 2015, attaching the administrative record, and argued that Ariana M.'s claims received full and fair review and that its denial of benefits was reasonable and based on substantial evidence. (Docket Entry No. 39). In support, Humana stated that Dr. Prabhu and Dr. Hartman, both board-certified psychiatrists, had determined

that continued partial hospitalization was not medically necessary for Ariana M. after June 4. Humana recited Dr. Prabhu and Hartman's medical-record reviews and their findings that Ariana M. failed to meet the Mihalik criteria for continued partial hospitalization because she did not pose an imminent danger to herself or others, she did not report psychosis or mania, she was medically stable, and she was refusing to cooperate with the Avalon Hills treatment.

Ariana M. opposed Humana's motion and cross-moved for summary judgment. (Docket Entry No. 44). She contended that she met the Mihalik criteria because her attending physicians opined that she remained at risk to harm herself, restrict eating, or overexercise if she left partial hospitalization. (*Id.*).[4] Ariana M. also argued that Humana had a conflict of interest because it both evaluated and paid claims, and that it took inadequate measures to reduce bias and to promote accuracy. (*Id.*).

Attached to Ariana M.'s motion for summary judgment were her medical records from Avalon Hills between April and September, a deposition of Dr. Hartman from unrelated litigation, and her father's notes from a conversation with the Mihalik Group. (Docket Entry Nos. 44-1–9). Humana moved to strike these documents because they were not in the administrative record on which Humana based its decisions. (Docket Entry No. 47). Ariana M. responded that these documents were admissible to help the court understand medical terminology and Humana's previous interpretations of medical necessity. (Docket Entry No. 50). She did not dispute that these

---

[4]  She also argued that Humana's reviewers should have consulted the American Psychiatric Association Practice Guideline for the Treatment of Patients with Eating Disorders and that Humana should not have relied on the Mihalik criteria because they were not incorporated in Ariana M.'s insurance plan and did not reflect national standards of care. (Docket Entry No. 44).

documents were outside the administrative record and were not available to Humana when it reviewed and denied the claim.

This court granted Humana's motion for summary judgment, dismissed the motion to strike as moot, and entered judgment against Ariana M. (Document Entry No. 52). This court first determined that Humana's review process was not procedurally unreasonable because it carefully reviewed the claim and hired third-party reviewers if it was denied. (*Id.*). This court then reviewed Humana's medical necessity determination for abuse of discretion, as Fifth Circuit law required, finding that Ariana M. failed to establish that the Mihalik criteria did not reflect national standards of care and failed to identify sufficient evidence in the administrative record to show that Humana abused its discretion. (*Id.*).

Ariana M. appealed and a panel of the Fifth Circuit affirmed. *Ariana M. v. Humana Health Plan of Tex., Inc.*, 854 F.3d 753 (5th Cir. 2017). Sitting en banc, the Fifth Circuit overturned the panel decision and changed the standard of review of a plan administrator's factual determinations from abuse of discretion to *de novo*. *Ariana M.*, 884 F.3d at 256. It vacated the order granting summary judgment and remanded for *de novo* review. *Id.*

On remand, Ariana M. moved for summary judgment, arguing that her partial hospitalization at Avalon Hills remained medically necessary after June 4. Ariana M.'s primary evidence is Dr. Roskos's opinion that she was "at high risk of relapse and self-harm" if she left partial hospitalization. (Docket Entry No. 70 at 12). She also contends that the Mihalik criteria are inadequate and that Humana failed to provide them to her during the administrative process. In the alternative, Ariana M. argues that she met the Mihalik criteria between June 4 and September 18. Ariana M. does not contend that Humana had a conflict of interest.

Humana responded and moved for summary judgment. (Docket Entry No. 75). Humana argues that Ariana M.'s claim for continued partial hospitalization received full and fair review because both Dr. Prabhu and an independent reviewer, Dr. Hartman, examined her records and personally talked to her attending physicians in determining medical necessity. (*Id.* at 15–17). Humana contends that the Mihalik criteria incorporate national standards of medical practice, as required under Ariana M.'s plan, and noted that this court and the Fifth Circuit have so ruled.[5] In Humana's judgment, the undisputed evidence in the record shows that, as a matter of law, Ariana M. did not meet medical necessity for continued partial hospitalization after 49 days. Ariana M. was not a danger to herself or others; was medically stable; was on stable medication; was maintaining a healthy weight; was confronting her problems; and was not cutting herself or engaged in eating disorder behaviors that changed her weight, including on trips home, away from Avalon Hills. In addition, Ariana M. was refusing to cooperate in elements of her treatment. Humana concluded that Ariana M. could be treated in intensive outpatient care near her home.

## II. The Motion to Strike

Ariana M. attached to her summary judgment motion the Avalon Hills medical records and reports from April to September, a deposition of Dr. Hartman from unrelated litigation, and her father's notes from a conversation he had with the Mihalik Group. Humana moved to strike this evidence because it was outside the administrative record. (Docket Entry No. 74). Ariana M.

---

[5] *See Ariana M.*, 854 F.3d at 761 ("[Ariana M.] is incorrect that the Mihalik criteria do not represent nationally recognized standards of medical practice. Instead, the record indicates that the Mihalik criteria are intended to represent nationally recognized standards of medical practice, were created in consultation with a group of doctors and health professionals from across the country, and were based on extensive medical literature."); *Ariana M. v. Humana Health Plan of Tex., Inc.*, 163 F. Supp. 3d 432, 442 (S.D. Tex. 2016) ("[Ariana M.'s] evidence does not show that the Mihalik criteria fail to represent nationally recognized medical standards or are otherwise inaccurate. And Ariana M. cites no case law to support this argument.").

responded that the court "may consider all facts known to Humana at the time it denied [Ariana M.'s] claim," even if Ariana M. had not submitted the documents to Humana for consideration. (Docket Entry No. 83 at 1). She also contends that the documents come in under either the exception for evidence that helps the court understand medical terminology or that shows how Humana interpreted the plan in the past. (*Id.*).

Once an administrative record is finalized, "a district court must remain within its bounds in conducting a review of the administrator's findings, even in the face of disputed facts." *Ariana M.*, 884 F.3d at 256 (citing *Vega v. Nat'l Life Ins. Servs.*, Inc., 188 F.3d 287, 299 (5th Cir. 1999) (en banc), *overruled on other grounds by Metro Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343 (2008)). The administrative record "consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit in a manner that gives the administrator a fair opportunity to consider it." *Vega*, 188 F.3d at 300. The plan administrator must "identify evidence in the record" and provide "claimants a chance to contest whether that record is complete." *Ariana M.*, 884 F.3d at 256. A claimant introduces evidence into the administrative record "by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it." *Vega*, 188 F.3d at 300.

A district court may admit documents outside the administrative record only to help "evaluate the administrative record." *Ariana M*, 885 F.3d at 256. The court may admit documents showing how the administrator interpreted the plan terms in the past or what unclear medical terminology means. *Vega*, 188 F.3d at 299. The district court cannot consider documents or information outside the administrative record if they bear on "disputed material facts—i.e., a fact the administrator relied on to resolve the merits of the claim itself." *Id.*

The court grants Humana's motion to strike because Ariana M.'s proffered documents are outside the administrative record and do not qualify for an exception. Ariana M. asserts that the court can admit the documents because at least some of them contain information available to Humana when it denied her claim. But Ariana M. does not explain which documents were available, or how or when she submitted the documents to the plan administrator during the administrative process. *Id.* at 300. The documents are not part of the administrative record. *Id.* at 299–300; *see Dix. v. Blue Cross & Blue Shield Ass'n Long Term Disability Program*, 613 F. App'x 293, 295, 296–97 (5th Cir. 2015) (a court refused to consider medical records outside the administrative record).

Ariana M. also argues that the documents could help the court understand the record. *Id.* at 300. That argument fails as well. Ariana M. uses the documents to argue that Humana's review process was inadequate and that her partial hospitalization was medically necessary. Those questions go to the merits. The documents attached to her summary judgment motion, which she failed to enter into the administrative record, cannot be used for that purpose, and they do not illustrate how Humana had interpreted the plan terms in the past . The motion to strike is granted.

## III. The Motions for Summary Judgment

"Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Vann v. City of Southaven, Miss.*, 884 F.3d 307, 309 (5th Cir. 2018) (quotation omitted); *see also* Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Burrell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 136 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)). "[A]

party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

The court reviews the administrative record *de novo* to determine whether Humana wrongfully denied Ariana M. benefits for her partial hospitalization starting from June 5 to September 18, after paying benefits from April 15 to June 4. *Ariana M.*, 884 F.3d at 256. *De novo* review requires that the court apply the same standard as the plan administrator in deciding whether the benefits were owed under the plan's terms. *Cf. Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 447 (5th Cir. 1995).

Humana and its independent reviewers used the Mihalik criteria, including its first criterion incorporating the national standards of care, to assess medical necessity.[6]  The first question is whether the Mihalik criteria are consistent with Ariana M.'s plan and reflect national standards of care for mental health treatment.  If so, the second question is whether Ariana M.'s continued partial hospitalization was medically necessary under the national standards.

The Mihalik criteria are consistent with Ariana M.'s plan.  The Mihalik criteria track the plan's definition of "medical necessity," providing Humana's reviewers with guidance to implement the language.  *See Ariana M.*, 854 F.3d at 758 ("[T]he Mihalik criteria simply provide [Humana]'s

---

[6]  In its order granting summary judgment for Humana, the court ruled that Humana's independent review process cured any conflict of interest.  *See Ariana M.*, 163 F. Supp. 3d at 440–42.  Ariana M. did not challenge that determination on appeal, *Ariana M.*, 854 F.3d at 758 n.3, and she did not raise it in her renewed motion for summary judgment.  She has waived that argument.

claims adjusters guidance in carrying out the terms of the Plan. . . .  [N]othing in the Mihalik criteria's definition of medical necessity is inconsistent with the Plan's terms.").[7]

The administrative record indicates that the Mihalik criteria include national standards of care.  The Mihalik manual states that the criteria are "designed to focus on nationally accepted criteria" and were reviewed by "a National Advisory Panel comprised of behavioral health specialists from a variety of backgrounds and experiences."  (Admin. Record at 1507, 1513).  The manual provides 10 pages of references and authorities, including articles in peer-reviewed journals, guidelines issued by the American Psychiatric Association, and psychiatry textbooks from major publishers.  (*Id.* at 1696–1707).  Ariana M. has not identified evidence showing that the Mihalik criteria fall below, fail to reflect, or conflict with national standards of care.

Ariana M. contends that the Mihalik criteria do not track national standards of care because a "for-profit consulting company" created them.  (Docket Entry No. 70 at 19).  The fact that a company created the Mihalik criteria does not mean that they fall below, fail to reflect, or conflict with national standards of care.  Ariana M. contends that Humana should have used the American Psychiatric Association's guidelines, and not the Mihalik criteria.  But the American Psychiatric Association is itself a private organization; Ariana M. does not explain why its guidelines are more reliable, or how they conflict with the Mihalik criteria.  Humana did not err in using the Mihalik

_____

[7] Ariana M. claims that Humana did not provide free access to the Mihalik criteria, citing 29 C.F.R. § 2560.503–1(h)(2)(iii).  That regulation reads: "a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits."  *Id.*  Humana need not provide "free access" to the Mihalik criteria, as Ariana M. argues.  (Docket Entry No. 70 at 19).  Humana's denial of benefits stated: "At your request, we'll send you — at no cost — a copy of any guideline, criteria, or clinical rationale we relied on."  (Admin. Record at 376).  The record does not contain a request for the Mihalik criteria, and Humana therefore had no obligation to produce them.  In addition, the record shows that Humana supplied the relevant Mihalik criteria in its letter denying benefits.  (*Id.* at 1404–05).

criteria to assess medical necessity.

A *de novo* review of the administrative record reveals that Humana made no error in denying benefits for Ariana M.'s partial hospitalization after June 4, 2013. As a threshold matter, Humana provided Ariana M. a full review. Humana sent each of Ariana M.'s claims for extended review to a board-certified psychiatrist. The psychiatrists contacted Ariana M.'s treating physicians and reviewed her medical records.[8] They wrote findings and conclusions. When Ariana M. appealed a denial, Humana sent her claim to independent, board-certified psychiatrists for review.[9] They spoke with Ariana M.'s treating physicians, reviewed her medical records, and made detailed written findings and conclusions. Humana followed the independent reviewers' recommendations, including when they concluded that continued partial hospitalization was medically necessary for Ariana M.[10] Each of her claims and appeals was reviewed within a few days. Humana's administrative process was prompt and designed to eliminate bias by using third-party reviewers and current information from her treating physicians.

---

[8] Ariana M. argues that the medical reviewer's failure to examine Ariana M. themselves calls their evaluation into question. The Fifth Circuit has rejected this argument. *See Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 515 (5th Cir. 2010) ("That the independent experts reviewed Anderson's records but did not examine him personally also does not invalidate or call into question their conclusions.").

[9] Ariana M. argues that Humana erred by providing Dr. Prabhu's medical review to Dr. Hartman. She contends that this biased his decision-making. Humana gave Ariana M.'s record to Dr. Hartman, including the opinions of her attending physicians and Dr. Prabhu, which he required to investigate the claim. It did not instruct him to defer to Dr. Prabhu. Ariana M. has not identified evidence supporting that Dr. Hartman relied on Dr. Prabhu's opinion, other than that he reached the same conclusion as Dr. Prabhu. That is not enough.

[10] Ariana M. challenges the qualifications of Dr. Hartman. Her evidence on Dr. Hartman comes from a deposition in a previous case that is outside the administrative record. The court cannot consider that evidence. The administrative record discloses that Dr. Hartman is a board-certified psychiatrist. (Admin. Record at 368). He is qualified to review Ariana M.'s claim.

Ariana M.'s continued partial hospitalization was not medically necessary under the plan terms. The administrative record shows that Ariana M. was stable on June 4. She denied any suicidal ideation, homicidal ideation, or psychosis. She had not attempted to harm herself during her time at Avalon Hills, including during visits home.[11] Ariana M.'s weight was steady. She had not had major weight changes, including during trips home. She had no acute medical complications from her disorder. Her medication level was stable. Her parents had begun to cooperate more with the therapy, suggesting that they better understood the problem and could support her. While she reported urges to harm herself, purge, and overexercise, she had largely resisted those urges, except for self-reporting that she had exercised on one trip home more than she had agreed on with the Avalon Hills staff. In recommending that Humana deny Ariana M.'s claim, Dr. Hartman walked through each relevant Mihalik criteria. This court does the same, applying *de novo* review. Ariana M. had to meet eight "General Criteria" throughout "the episode of care." (*Id.* at 127). Ariana M. failed to satisfy two of them.

- "The services must be individualized, specific, and consistent with the individual's signs, symptoms, history, and diagnosis." (*Id.* at 1566).

While Ariana M. continued to exhibit "anxiety and depression," she had not harmed herself or purged since her admission to Avalon Hills, including on visits home. (*Id.* at 326). She did report some exercise at home that exceeded the limit set by the Avalon Hills staff. (*Id.*). Whatever the extent of Ariana M.'s overexercising, it did not change her weight. Nor did any attempts to restrict food intake, which are not described in the record, change her weight. While weight is only one

---

[11] Dr. Roskos reported that Ariana M. had attempted to harm another patient on May 7, which factored into the reviewer's conclusion that her continued partial hospitalization remained medically necessary for "approximately 10 days." (Admin. Record at 184). Humana accepted the recommendation, authorizing an additional 10 days of partial hospitalization. By June 4, there were no other attempts to harm others.

factor among many in determining medical necessity for Ariana M.'s continued partial hospitalization, it is a factor. She denied suicidal, homicidal, or psychotic thoughts, and she was physically healthy and medically stable. (*Id.*). The "whole team sa[id] she really has cont[inued] to exhibit multiple changes in moving towards recovery." (*Id.*).

Dr. Hilton worried that Ariana M. still had "urges" and that leaving the structure of partial hospitalization would send her "in a downward spiral." (*Id.*). The presence of "urges" and the risk of succumbing to them after improvement and stability is ever present for most who suffer from addictions or mental illness, including eating disorders. After 49 days in partial hospitalization, Ariana M. had stabilized and improved enough to transition to a lower level of care. Humana would cover intensive outpatient care, which required Ariana M. to attend "[g]roup therapeutic sessions greater than one hour a day, three days a week," focused on behavioral health, recovery strategies, skills development, and family interaction, with access to a physician "for medical and medication management." (*Id.* at 876). Partial hospitalization was no longer required by the plan terms, given her symptoms, history, and diagnosis.

• "The individual complies with the essential elements of treatment." (*Id.* at 1566).

Drs. Roskos and Hartman reported that Ariana M. was refusing to cooperate in her treatment at Avalon Hills. In his discussion with Dr. Prabhu, Dr. Hilton stated: "[Ariana M.] is pretty reactive to intervention and is showing little willingness to work on her issues right now but she kind of goes in and out of that a bit. She is pretty resistant and . . . is pushing back." (*Id.* at 326). Dr. Hilton told Dr. Hartman that "[Ariana M.] has a lot of ambivalence since Avalon is not changing program to suit her whims." (*Id.* at 367). Dr. Roskos told Dr. Kiriakos that Ariana M. had low motivation to

recover and participated only in treatment that "she wants to do." (*Id.* at 1715). Because Ariana M. did not cooperate in her treatment, she failed this criterion. The record, reviewed *de novo*, supports that finding.

Ariana M. also needed to meet six "Treatment Criteria" for "each day that services [were] provided." (*Id.* at 1566–67). Ariana M. failed to meet at least one of them.

- "The individual does not have adequate internal resources or an adequate external support system to maintain functioning without the support of an intensive multi-modal, multi-disciplinary treatment program that includes medical and/or nursing care." (*Id.* at 1566).

During most of her 49 days at Avalon Hills, Ariana M. had proven able to resist urges to harm herself, purge, and overexercise. (*Id.* at 326, 367). Because of this, Avalon Hills permitted her a higher level of physical activity and flexibility in meals. (*Id.* at 220, 326). Ariana M. had demonstrated the internal resources necessary to largely control her behaviors, with none of the more self-destructive acts, and to resist those urges over the 49 days she spent at Avalon Hills. Her Avalon Hills doctors also reported that her parents had learned to "hold[] the line more" during family therapy sessions, strengthening her external support system. (*Id.* at 326). *De novo* review shows ample evidence supporting the conclusion that she did not meet this criterion as of June 4.

For "each day that services [were] provided," Ariana M. also had to meet one of the "Treatment Initiation Criteria":

- As a result of the mental disorder or condition, the individual is now a clear and present danger to self, a clear and present danger to others, or unable to provide for basic self-care needs resulting in impending, serious self-harm. . . .

- As a result of the mental disorder or condition: . . .

    The individual demonstrates significant impairment in social, occupational, scholastic or role functioning that represents a deterioration in level of functioning.

    AND

26

. . . The individual has participated in and failed a substantial course of traditional or intensive outpatient treatment in the past three months.

OR

. . . It is clinically probable that the individual will require initiation of a higher level of care if services are not provided at this level.

(*Id.* at 1567). Ariana M. failed to satisfy these Treatment Initiation Criteria. By June 4, Ariana M. did not pose a clear and present danger to herself or others. She was physically healthy. She had not attempted to harm herself. She did not have suicidal, homicidal, or psychotic thoughts. The record discloses that Ariana M. had attempted to harm another patient on May 7, but had made no similar attempts since then. Her weight had not meaningfully changed during her time at Avalon Hills.

Ariana M.'s health and improvement support the reviewers' finding that she did not require the higher level of care of partial hospitalization and could move to intensive outpatient care. To whatever extent Ariana M. attempted to restrict her food intake, or overexercise on trips home, she had maintained her weight and her medication was stable. Even if Ariana M. might in the future need to return to partial hospitalization, nothing in the record suggests that in intensive outpatient care, Ariana M. would quickly deteriorate to the point that partial or full hospitalization would be necessary.

The record discloses that Ariana M. had failed intensive outpatient treatment before being admitted to Avalon Hills. It does not say whether this treatment was within three months of her admission there and does not undermine the conclusion as to medical necessity on June 4. Ariana M. does not carry the burden of proof on this point.

Lastly, Ariana M. had to satisfy six "Treatment Continuation Treatment" during "the episode of care." (*Id.* at 128). Ariana M. failed to meet at least one of them.

- "The treatment goals, interventions, time frames, anticipated outcomes, discharge plan, and criteria for discharge are clinically efficient, reasonable, and achievable in the length of stay typically associated with treatment at this level." (*Id.* at 1568).

The record does not contain a structured plan by Avalon Hills to transition Ariana M. out of partial hospitalization. As Dr. Hartman noted on June 11, "there is no plan to meet with [Ariana M.'s] parents again for two to three weeks." (*Id.* at 368). On April 23, Avalon Hills estimated Ariana M.'s length of stay to be 30 days. (*Id.* at 133). Forty-two days later, on June 4, Avalon Hills requested more time in partial hospitalization, without any indication as to how much time Ariana M. likely needed or any explanation as to why there was no transition plan in place. This criterion is not met.

Ariana M. failed to meet several of the Mihalik criteria based on the facts in the administrative record. While remaining at Avalon Hills might have been beneficial for her, it was not medically necessary after June 4. By that date, Ariana M. had spent 49 days in partial hospitalization, where she had maintained a healthy weight and resisted urges to purge, harm herself, or overexercise even unsupervised (except by some unknown amount beyond what she had agreed on with Avalon Hills). Her eating and exercising behaviors did not prohibitively harm her health or change her weight and she was allowed a flexible meal plan and an increase in exercise. Humana did not err in determining that Ariana M.'s hospitalization was medically unnecessary after June 4. The undisputed facts in the administrative record, reviewed *de novo*, showed that Humana did not deny plan benefits owed to Ariana M.

Ariana M. contends that her treating physicians' opinions are owed greater deference than those of Humana's reviewers. Precedent forecloses this argument. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 1972 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician.");

*Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 233 (5th Cir. 2004) ("In *Black & Decker . . .* , the Supreme Court held that ERISA does not require plan administrators to accord special deference to the opinions of treating physicians."). Alternatively, Ariana M. argues that the court should defer to her treating physicians' opinions because mental illness presents subjective symptoms that require observation to detect. (Docket No. 70 at 24–25). Humana hired board-certified psychiatrists to review Ariana M.'s claims for this reason. Humana's reviewers spoke with Ariana M.'s attending physicians to hear their observations and opinions. After personally talking to attending physicians and examining Ariana M.'s medical records, Humana's reviewers made an independent determination. The reviewers credited the opinions of Ariana M.'s treating physicians, but on June 4, found that their observations about Ariana M. supported denying extended benefits for partial hospitalization in favor of intensive outpatient care.

Humana's independent review process placed a third party between its plan administrator and Ariana M.'s partial hospitalization providers. Both had a conflict of interest. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 119, 128 S. Ct. 2343, 2352 (2008) (Roberts, C.J., concurring) ("[A] third-party insurer's dual role as a claims administrator and plan funder gives rise to a conflict of interest that is pertinent in reviewing claims decisions."); *Salley v. E.I. DuPont de Nemours & Co.*, 966 F.2d 1011, 1016 (5th Cir. 1992) (a treating physician has a conflict of interest where "the treating physician would stand to profit greatly if the court were to find benefits should not be terminated"). In this case, the psychiatrists agreed on the facts but differed in their conclusions.

In denying her benefits for partial hospitalization, Humana did not cut Ariana M. off from treatment. It stated, "This patient can be treated at the following level of care: Intensive Outpatient Program." (*Id.* at 331). If her condition worsened in outpatient care, and partial hospitalization became medically necessary, Ariana M. could seek benefits from Humana once more. Ariana M.

chose against transitioning into outpatient care, and instead stayed at Avalon Hills for 106 more days.

## IV. The Motion for Attorney's Fees

Ariana M. seeks the fee her attorneys incurred on the appeal to the Fifth Circuit. Humana responded. (Docket Entry No. 79). Ariana M. replied. (Docket Entry No. 80).

The court may award attorney's fees to the fee claimant, "as long as the fee claimant has achieved 'some degree of success on the merits.'" *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 244–45, 130 S. Ct. 2149, 2152 (2010) (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694, 103 S. Ct. 3274, 3282 (1983)). Ariana M. has not succeeded on her claim that her partial hospitalization was medically necessary after June 4. The Fifth Circuit vacated and remanded this court's order granting summary judgment for Humana so that the court could apply a *de novo* standard. The appellate court did not indicate that Ariana M.'s claim had, or lacked, merit.[12] This court found that under either an abuse of discretion or *de novo* standard of review, Ariana M. did not succeed in showing that Humana denied her benefits owed under her plan. Ariana M.'s motion for attorney's fees is denied. Each side will bear its own fees.

## V. Conclusion

Humana did not owe Ariana M. benefits for partial hospitalization at Avalon Hills between June 4 and September 18. Humana had covered 49 days of continued partial hospitalization, including board, for seven days a week. Continued partial hospitalization was not medically

---

[12] *See Ariana M.*, 884 F.3d at 257 ("A different standard of review will sometimes lead to a different outcome, but there will also be many cases in which the result would be the same with deference or without it. We give no opinion on which is the case here . . . ."); *id.* at 268 (Elrod, J., dissenting) ("This is a waste of judicial resources because there is no genuine issue of material fact and the record establishes that the plan administrator did not err in declining to cover Ariana's additional partial hospitalization.").

necessary after June 4.[13]

      Humana's motion for summary judgment is granted, (Docket Entry No. 75), its motion to strike is granted, (Docket Entry No. 74), Ariana M.'s cross-motion for summary judgment is denied, (Docket Entry No. 70), and Ariana M.'s motion for attorney's fees is denied, (Docket Entry No. 77). Final judgment is separately entered.

      SIGNED on September 14, 2018, at Houston, Texas.

                              Lee H. Rosenthal
                          Chief United States District Judge

---

[13] Humana also argued that ERISA preempts the Texas law that bans the delegation of discretion to plan administrators. (Docket Entry No. 75 at 27–28). The court need not address that argument.